CITY PENSION FUND FOR FIRE-FIGHTERS AND POLICE OFFICERS IN the CITY OF MIAMI BEACH, individually and on behalf of all others similarly situated, Plaintiff,

v.

ARACRUZ CELLULOSE S.A., Carlos Alberto Vieira, Carlos Augusto Lira Aguiar, and Isac Roffe Zagury, Defendants.

Case No. 08–23317–CIV.

United States District Court, S.D. Florida.

Signed Sept. 16, 2011.

Joseph E. White, III, Lester Rene Hooker, Maya Susan Saxena, Sazena White, P.A., Boca Raton, FL, for Plaintiff.

Claudine Columbres, Douglas P. Baumstein, Glenn M. Kurtz, White & Case, New York, NY, Jason Nelson Zakia, Maria Josefa Beguiristain, Rudolph F. Aragon, White & Case, Rodney Quinn Smith, II, Katherine Alena Sanoja, Gomm & Smith, P.A., Miami, FL, Joseph E. White, III, Saxena White PA, Boca Raton, FL, for Defendants.

## OMNIBUS ORDER ON MOTIONS TO DISMISS (D.E. 35, 74, 79) AND DEFENDANT ZAGURY'S MOTION TO STRIKE (D.E. 102)

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendants' motions to dismiss Plaintiff's Amended Class Action Complaint ("Complaint," D.E. 30). On November 13, 2009, Defendant Aracruz Cellulose S.A. ("Aracruz") filed its Motion to Dismiss the Amended Class Action Complaint ("Aracruz's Motion," D.E. 35).[1] On October 15, 2010, Defendants Carlos Alberto Vieira ("Vieira") and Carlos Augusto Lira Aguiar ("Aguiar") filed their Motion to Dismiss the Amended Class Action Complaint ("Vieira and Aguiar's Motion," D.E. 74).[2] Finally, also on October 15, 2010, Defendant Isac Roffe Zagury ("Zagury") filed his Motion to Stay These Proceedings and Dismiss the Amended Complaint ("Zagury's Motion," D.E. 79).[3] In addition, on

---

1. On December 22, 2009, Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach filed its response in opposition (D.E. 47), to which Aracruz filed its reply (D.E. 49), on January 28, 2010.

2. On November 5, 2010, Plaintiff filed its consolidated response in opposition to Vieira and Aguiar's Motion. (*See* D.E. 91.) Vieira and Aguiar filed their reply on December 3, 2010. (*See* D.E. 99.)

3. Plaintiff's response to Zagury's Motion was consolidated with its response to Vieira and Aguiar. (*See* D.E. 91.) Zagury filed his reply on December 3, 2010. (*See* D.E. 100.) Zagu-

December 24, 2010, Defendant Zagury filed his Motion to Strike ("Motion to Strike," D.E. 102), certain declarations, affidavits, and the Commissão de Valores Mobiliários ("CVM") translated findings (D.E. 98).[4] Having considered the various motions, related pleadings, and the record, the Court finds as follows.[5]

## I. Background

This case involves a class action complaint against Aracruz, a Brazilian manufacturer of hardwood and paper products, and several of its officers or former officers, Vieira, Aguiar, and Zagury (collectively the "Individual Defendants"), for violations of federal securities laws. On October 5, 2009, Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Miami Beach ("Plaintiff")[6] filed its Complaint which alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act ("PSLRA"), and Rule 10b-5 promulgated thereunder, against all Defendants and violations of Section 20(a) against the Individual Defendants. Plaintiff represents a class of investors who purchased American Depository Receipts ("ADRs")[7] traded on the New York Stock Exchange, or common stock traded on the Bovespa, from Aracruz during the proposed class period of April 7, 2008, to

---

ry summarily adopts those arguments raised by Aracruz, Aguiar, and Vieira. (*See* D.E. 100 at 1 n. 1.)

4. On January 10, 2011, Plaintiff filed its response in opposition (D.E. 103), to which Zagury filed his reply on January 20, 2011 (D.E. 104).

5. On September 30, 2010, the Court denied Aracruz's Motion on the docket stating an amended order would follow. (*See* D.E. 69.) This Order serves such purpose.

6. On August 7, 2009, the Court appointed City Pension Fund for Firefighters and Police Officers in the City of Miami Beach as lead plaintiff and the law firm of Saxena White P.A. as lead counsel. (*See* D.E. 27)

7. Black's Law Dictionary defines ADRs as "[a] receipt issued by an American bank as a *substitute* for *stock* shares in a foreign-based corporation. ADRs are the most common method by which foreign companies secure American shareholders. Companies that offer ADRs maintain a stock listing in their domestic market in their domestic currency, while the ADRs are held in U.S. dollars and listed on a U.S. stock exchange, usu. the New York Stock Exchange." BLACK'S LAW DICTIONARY (8th ed.2004). The Third Circuit in *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 367 (3d Cir.2002) provides a helpful description:

ADRs were created in 1927 to assist American investors who wanted to invest internationally, but were reluctant to do so due to regulatory and currency exchange difficulties. *See* Melissa Wilverding, Depository Receipts, II Global View (Brown Brothers Harriman), 2001, at 3. They also offered significant benefits to foreign companies, allowing them to tap into the American capital market. *See id.* They have since become one of the preferred methods for trading foreign securities in the United States, with the value of ADRs bought and sold annually in the hundreds of billions. *See* Bruce L. Hertz, American Depository Receipts, 600 P.L.I./Comm. 237, 239 (1992).

An ADR is a receipt that is issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. *Id.* at 240–41. The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depositary, the custodian, or their agent. *Id.* at 241. ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act. *Id.* at 242, 246. This makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market. *Id.* at 240.

October 2, 2008 ("Class Period"). The facts set forth in the Complaint are as follows.[8]

Aracruz is a major Brazilian manufacturer of forest products and one of the largest pulp manufacturers in the world. (Complaint at ¶ 4.) Its main products are bleached eucalyptus pulp and high-grade hardwood, which it markets internationally to manufacturers of consumer paper products. (*Id.*) The company reported net operating revenues of approximately $1.7 billion, $1.8 billion, and $1.9 billion for the years 2006, 2007, and 2008 respectively. (*Id.* at ¶ 21.) Zagury acted as Aracruz's Chief Financial Officer ("CFO") and Director of Investor Relations during the relevant time period until his resignation on October 3, 2008. (*Id.* at ¶ 18.) Aguiar currently acts as Aracruz's Chief Executive Officer ("CEO") and President and did so during the relevant time period. (*Id.* at ¶ 17.) Vieira served as Aracruz's Chairman of the Board from April 29, 2004, until his resignation on March 6, 2009. (*Id.* at ¶ 16.)

During the relevant time period, Aracruz engaged in financial transactions described as "currency hedging" or "foreign exchange risk hedging" in order to hedge its exposure to foreign currency and interest rate fluctuation. (*Id.* at ¶¶ 6, 27.) Currency hedging is a mechanism by which a company, particularly those involved in exporting, can protect itself against exchange rate volatility and ensure that it collects approximately the same value it contracted for upon realization of payment. (*Id.* at ¶ 6.) Because Aracruz receives much of its payments for exports in U.S. Dollars, but incurs many of its costs in *reais*, Aracruz entered into a number of currency derivative contracts ostensibly to hedge against its exposure to the U.S. dollar. (*Id.* at ¶ 7.) In essence, the purpose of these derivative transactions was to offset any gain or loss of value caused by the appreciating *real*. (*Id.* at ¶ 29.)

Plaintiff contends that, contrary to its public statements regarding the purpose and scope of its currency hedging activities, Aracruz engaged in highly speculative transactions in order to profit from the substantial appreciation of Brazil's currency. (*Id.* at ¶ 8.) In sum, Plaintiff asserts that Defendants increasingly placed larger and more speculative bets that Brazil's currency would continue to appreciate against the U.S. dollar. (*Id.*) Between 2004 and mid–2008, the Brazilian *real* steadily appreciated in value. (*Id.* at ¶ 30.) When the value of Brazil's currency rapidly plummeted towards the latter part of 2008, the company suffered approximately $2.1 billion in losses in connection with these currency derivative contracts. (*Id.* at ¶ 9.) According to Plaintiff, prior to Aracruz's revelation of the extent of its losses in the fall of 2008, Defendants made various false and misleading statements regarding the nature of Aracruz's exposure. These allegedly false statements can be grouped into two categories: the April 2008 disclosures and the July 2008 disclosures (collectively the "Disclosures").[9]

---

**8.** The following facts are gleaned from Plaintiff's Complaint and are deemed to be true for purposes of the motions to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs I)*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

**9.** The Complaint quotes substantial portions of the Disclosures as misleading or false statements (including seemingly irrelevant or innocuous language) but at times fails to go into more specificity as to exactly what language it contends is misleading. Pursuant to the PSLRA the Court is required to undertake a piecemeal examination of the statements alleged to be false. *See Harris v. Ivax Corp.*, 182 F.3d 799, 804 (11th Cir.1999).

On April 7, 2008, Aracruz filed its Form 6–K with the SEC and issued its quarterly earnings report for the first fiscal quarter. The April 2008 6–K was signed by Aguiar and stated that, "[t]he Company's foreign currency risk and interest rate management strategy may use derivative transactions to protect against foreign exchange and interest rate volatility." (*Id.* at ¶ 33.) The 6–K also disclosed that:

> During the three-month period ended March 31, 2008 the Company recognized gains of US\$ 7.0 million on swap transactions (TJLP or interest long-term rate against the U.S. Dollar). There were no such derivative instruments for the three-month period ended March 31, 2007. As of March 31, 2008, the notional amounts of these swaps totaled US\$ 345.4 million and the result oustand [sic] balance was an asset of US\$ 36.2 million.

(*Id.*) The April 2008 earnings report contained statements by Zagury to the effect that:

> At the end of the 1 Q08, we increased the level of our cash flow currency protection, to a \$270 million short position in dollars, representing 5 months of future exposure, which generated a positive impact of \$4 million in the quarter. We also continued to swap financial liabilities from "TJLP plus spread" into "dollar coupon" fixed rates, which generated a positive impact of \$7 million during the period.

(*Id.* at ¶ 34.) Plaintiff alleges these statements inaccurately depict the company's currency transactions as conservative and only consisting of five months of exposure. (*Id.*) The earnings report further states that:

> It is also important to note that the exchange rate impact will continue to shape the market pulp business, as the devaluation of the American dollar per-

sists, leading either to price increases or to additional closures by local producers unable to absorb the increased costs.

\* \* \*

> The "Financial Income in the quarter was \$10.2 million higher than in the 4Q07, mainly due to the favorable results of our gains on derivative transactions, which amounted to \$13.1 million in the 1 Q08 (4Q07: \$3.5 million). When compared to the same period of last year, it was \$21.1 million lower, mainly due to lower gains on derivative transactions (1Q07: \$33.1 million).

> At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US\$270 million, which represented approximately 5 months of cash flow exposure to the local currency (real— R\$).

(*Id.* at ¶ 35.)

On July 7, 2008, Aracruz filed its Form 6–K with the SEC and issued its quarterly earnings report for the second fiscal quarter. (*Id.* at ¶¶ 55–56.) The July 2008 6–K was also signed by Aguiar and stated in part that:

> The Company operates internationally and is exposed to market risk from foreign exchange and interest rate volatility. The exposure of U.S. Dollar denominated liability does not represent a risk from an economic and financial standpoint, because the future payment in local currency of such liability is offset by operating revenue which is expressed in U.S. Dollars since almost all sales originate from exportation.

(*Id.* at ¶ 55.) It also repeated that, "[t]he Company's foreign currency risk and interest rate management strategy may use derivative transactions to protect against foreign exchange and interest rate volatili-

ty." (*Id.*) The July 2008 earnings report contained statements by Zagury that:

We increased the level of our cash flow currency protection to a short position of $360 million at the end of the 2Q08 ($270 million at the end of the 1Q08), representing 6 months of future exposure, which generated a positive impact of $46 million in the quarter. In the first half of the year, the cash flow protection provided a gain of $15/t (when divided by the targeted full year production volume), thereby mitigating the negative impact of the Brazilian currency's appreciation against the dollar.

(*Id.* at ¶ 56.) The earnings report also stated in part that:

Protecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure.

* * *

The company has also been protecting its cash flow exposure to the local currency by taking short positions in dollars, which involves negligible transaction costs and has a positive carry. At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 360 million, which represented approximately 6 months of cash flow exposure to the local currency (real—R$).

(*Id.* at ¶ 57.) According to Plaintiff, Aracruz's website states that its Financial Policy "is designed to protect the company's cash generation exposure, as measured by the US$ EBITDA, to market risks associated with fluctuations in exchange rates."

(*Id.* at ¶ 58.) Similarly, the Financial Policy requires "linkage to an effective exposure (non-speculative hedging)," states that there is "no leveraging involved," states that the "asset side objective is the same as the risk factor that is to be protected," and that "engaging in structured financial transactions with built-in derivatives is strictly prohibited." (*Id.*) Plaintiff also asserts that Aracruz's Financial Strategy states that the company enters into forward foreign exchange contracts in order to "to minimize currency risk exposure" and "to protect against these market risks." (*Id.* at ¶ 59.)

Plaintiff claims the Disclosures were materially false and misleading because they failed to disclose that: (1) Aracruz entered into currency derivative contracts "far larger than necessary"; (2) such contracts violated the company's financial and internal control policies and contradicted public statements about the nature of such policies; (3) the company lacked adequate internal and financial controls; and (4) the company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made. (*Id.* at ¶¶ 36, 60.) In support, Plaintiff cites to Zagury's statements to the press that such transactions took place "in the first quarter of 2008." (*Id.* at ¶¶ 37, 61.) Plaintiff also contends the company's failure to disclose violated its Corporate Governance Policy, the Financial Policy and Strategy, and the currency risk management principles set forth in a 2005 Annual Report and Sustainability Report ("Sustainability Report"). (*Id.* at ¶¶ 23, 40, 62.) Plaintiff additionally cites to Zagury's statements to the press that the Board of Directors increased the exposure limit dictated by the company's Financial Policy from $600 million to $1 billion after the Board of Directors meeting in June 2008. (*Id.* at ¶ 63.) According to Plaintiff,

the increased exposure limit was not disclosed in the July 7, 2008, disclosures or in any Board of Directors meeting minutes for the June 19, 2008, June 20, 2008, July 1, 2008, or September 19, 2008, meetings. (*Id.* at ¶ 64.)

Plaintiff claims the Disclosures were made with the full knowledge, support, and approval of the Individual Defendants, as well as the company's other executives and officers. (*Id.* at ¶¶ 41–42, 65–66.) Furthermore, Aracruz admitted Zagury directed the currency transactions. (*Id.* at ¶¶ 41, 65.) In support, Plaintiff cites to Zagury's statements to the press that the company's Financial Committee and Board of Directors were aware of the currency transactions and approved them. (*Id.* at ¶¶ 42–47.) Plaintiff also generally suggests that Aracruz management, including the Individual Defendants, were motivated to engage in risky currency transactions in order to increase the company's revenue and therefore increase their own personal compensation. (*Id.* at ¶ 52.)

In the fall of 2008, the nature and extent of Aracruz's currency hedging activity was revealed. On September 26, 2008, Aracruz filed a Form 6–K with the SEC announcing that the company's "maximum loss volume on derivative transactions and also the total exposure to futures contracts based on U.S. Dollars may have exceeded the limits set forth in [the] Company's Financial Policy approved by the Board of Directors." (*Id.* at ¶ 67.) The disclosure was· signed by Aguiar. (*Id.*) Aracruz also announced that Zagury was resigning. (*Id.*) Nevertheless, the September 26, 2008, 6–K stated, "[t]here is currently no indication that any potential adjustments, as a consequence of the pending derivative contract analysis, will materially affect the Company's cash account." (*Id.*) The value of Aracruz ADRs dropped by $8.39 to close at $37.99 on September 26, 2008, and

dropped another $4.83 to close at $33.16 on the next trading day of September 29, 2008. (*Id.* at ¶ 68.)

On October 3, 2008, Aracruz filed another Form 6–K with the SEC announcing that the "fair value" of the company's currency derivative contracts as of September 30, 2008, was negative 1.95 billion *reais,* or negative $1.02 billion. (*Id.* at ¶ 72.) The disclosure was signed by Aguiar. (*Id.*) Following this announcement, Aracruz's ADRs declined $7.84 to close at $23.40 on October 3, 2008, and declined an additional $8.22 to close at $15.18, on the next trading day, October 7, 2008. (*Id.* at ¶ 73.) Aracruz subsequently filed additional 6–K forms with the SEC announcing Zagury was being replaced as CFO by Valdir Roque ("Roque"), the company was cancelling plans to pay interest on capital to shareholders, and the company's third quarter results which included a $1 billion charge related to the currency transactions. (*Id.* at ¶¶ 74–76.) In October 2008, several credit rating agencies announced they were downgrading Aracruz's investment grade. (*Id.* at ¶¶ 94, 96, 99.)

On November 4, 2008, Aracruz filed another Form 6–K with the SEC announcing that the company had unwound 97% of its current derivative contracts, resulting in a loss of $2.13 billion. (*Id.* at ¶ 78.) On November 18, 2008, Aracruz announced that Roque had resigned as CFO. (*Id.* at ¶ 79.) On November 25, 2008, Aracruz announced that a majority of shareholders had voted to institute legal action in Brazil against Zagury for "engaging in derivative transactions above and beyond the limits provided for in the company's Financial Policy." (*Id.* at ¶ 80.) On November 28, 2008, Aracruz announced the resignation of seven committee ·or Board of Directors members. (*Id.* at ¶ 81.)

Plaintiff brings this action for violations of the federal securities laws "on behalf of

all persons who purchased or otherwise acquired Aracruz ADRs on the NYSE during the Class Period and who were damaged thereby." (*Id.* at ¶ 115.)

On November 13, 2009, Aracruz filed its motion seeking to dismiss the Complaint pursuant to the PSLRA and Rules 9(b), 12(b)(5), and (6) of the Federal Rules of Civil Procedure. On October 15, 2010, the Individual Defendants also moved to dismiss the Complaint based on the PSLRA and Rules 9(b), 12(b)(2), (5), and (6). Zagury additionally moved to dismiss the Complaint based on forum non conveniens or to stay the proceedings under the doctrine of international abstention.

On July 22, 2010, the Court authorized alternative service of process on the Individual Defendants pursuant to Rule 4(f) of the Federal Rules of Civil Procedure. (*See* D.E. 65.) Specifically, the Court authorized a "dual-track" approach to service of process enabling Plaintiff to serve the Individual Defendants by means of personal service and registered mail in Brazil, along with its efforts to effect service via the Inter–American Convention on Letters Rogatory and Additional Protocol ("Inter–American Convention").

On August 16, 2011, in response to the Court's Order to Show Cause (D.E. 107), Plaintiff filed a Notice of Status of Service of Process for Defendants Carlos Alberto Vieira, Carlos Augusto Lira Aguiar, and Isac Roffe Zagury, indicating all three Individual Defendants had now been served pursuant to the Inter–American Convention.[10] (*See* D.E. 108.)

## II. Discussion

### A. Zagury's Motion to Strike

Zagury's Motion to Strike seeks to strike three documents submitted by Plaintiff in response to his motion to dismiss the Complaint. First, Zagury seeks to strike the affidavit of Alexandre Teixiera Gomes dated October 22, 2010 (the "Affidavit"), filed as proof of service as to Zagury. (*See* D.E. 92–2.) Second, Zagury moves to strike the declaration of Fabiano Defenti dated November 5, 2010 (the "Declaration"), also filed as proof that service of process was perfected upon Zagury. Zagury believes the Affidavit and Declaration both contain portions that include inadmissible hearsay, scandalous matter, and refer to documents not in evidence. Finally, Zagury seeks to strike the report issued by the CVM ("CVM Report"), as inappropriate for the Court's consideration under Rule 12(b)(6) and as lacking the evidentiary requirements for foreign records set forth in Rule 44(a)(2) of the Federal Rules of Civil Procedure and Rule 902(3) of the Federal Rules of Evidence.

In response, Plaintiff claims the Motion to Strike is untimely under Rule 12(f)(2) as it was filed after he filed his reply in support of his motion to dismiss and more than twentyone days after he was served with the documents. Plaintiff also asserts the Court should take judicial notice of the CVM Report, as it corroborates facts alleged in the Complaint and comes from an authoritative source as the CVM is the equivalent of Brazil's Securities and Exchange Commission. Finally, Plaintiff argues the Affidavit and Declaration are properly considered at this stage because they demonstrate Zagury has used intimidation and threats of physical violence to evade service of process.

In reply, Zagury urges his Motion to Strike was timely filed within twenty-one

---

**10.** As the Individual Defendants have now been served via personal service, registered mail, and pursuant to the Inter–American Convention, the Court deems moot and declines to address the Individual Defendants' various arguments that service of process was improper.

days of the CVM Report and should be considered on the merits. Zagury reiterates that the CVM Report consists of inadmissible hearsay and argues that judicial notice is improper under Rule 201 of the Federal Rules of Evidence. Moreover, Zagury contends the Affidavit and Declaration are prejudicial and disparage his reputation.

██ Rule 12(f) provides that, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." With regard to timing, Rule 12(f) provides the Court may act "on its own" or "on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Striking allegations from a pleading "is a drastic remedy to be resorted to only when required for the purposes of justice," and only when the allegations to be stricken have "no possible relation to the controversy." *Augustus v. Bd. of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir.1962) [11]; *Jackson v. Grupo Industrial Hotelero, S.A.*, 2008 WL 4648999 (S.D.Fla. Oct. 20, 2008).

Rule 201 of the Federal Rules of Evidence governs judicial notice of "adjudicative facts," or the facts of the particular case. FED. R. EVID. 201(a) & advisory committee's Note to Subdivision (a). A judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). The Court must take judicial notice if requested by a party and "supplied with the necessary information."

FED. R. EVID. 201(d). Furthermore, "[i]n a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed." FED. R. EVID. 201(g).

██ The Motion to Strike is denied. As an initial matter, the Individual Defendants have now all been served pursuant to the Inter–American Convention. As such, the Motion to Strike is moot as to the Affidavit and the Declaration as the Court no longer need consider their contents. Additionally, to the extent the CVM Report is a "pleading" for purposes of Rule 12(f), the Court declines to strike or take judicial notice of such report. The Motion to Strike is timely with regard to the CVM Report as it was filed within twenty-one days of it being served and was referenced in Zagury's reply. Nevertheless, there is no reason at this point in the litigation to strike the CVM Report as redundant, immaterial, impertinent, or scandalous. Moreover, Plaintiff concedes that it cannot offer the contents of the CVM Report for the truth of the matter asserted. Rather, Plaintiff states that it is "simply offering the CVM Report to show that the CVM (along with other governmental agencies) have launched investigations into Aracruz based on the Company's wildly speculative currency wagers" and that this lends support to an inference of scienter. The existence of the underlying CVM investigation and CVM Report, issued two years after the alleged false statements, provides little additional support for an inference of scienter. Plaintiff fails to explain why the Court would need to take judicial notice of the CVM Report at this stage in order to establish the fact that authorities in Brazil have initiated an

---

**11.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

investigation into Aracruz's derivative transactions. The CVM Report primarily consists of an evaluation of the appropriateness of settlement proposals submitted by various former Aracruz executives. Finally, the CVM Report was neither referenced nor attached to the Complaint, is not central to Plaintiff's claims, and does not clarify the contents of the Complaint. As such, the Court's consideration of its contents for purposes of the various motions to dismiss would be improper. *See Fed. Ins. Co. v. Bonded Lightning Prot. Sys., Inc.*, 2008 WL 5111260 at *3 (S.D.Fla. Dec. 3, 2008). Accordingly, the Court similarly declines to take judicial notice at this time except to the extent that the Court takes notice of the existence of the CVM investigation.

### B. Aracruz's Motion

Aracruz contends the Complaint should be dismissed because: (1) Aracruz is not amenable to service of process in the United States; (2) Plaintiff fails to plead with particularity what misstatements Aracruz made; (3) Plaintiff fails to adequately plead scienter; (4) Plaintiff fails to plead any facts demonstrating causation; (5) Aracruz's statements regarding its currency derivative trading were non-actionable forward-looking statements accompanied by ample and meaningful cautionary statements; and (6) there is no factual basis for Plaintiff's market manipulation claim.[12]

#### 1. Service of Process

■ Plaintiff served Aracruz by delivering copies of the original complaint (D.E. 1), to several law firms representing Aracruz in the United States including Greenberg Traurig LLP ("Greenberg"), Puglisi & Associates ("Puglisi"), and White & Case LLP ("W & C").

First, Aracruz claims it is not amenable to service in the United States because it never authorized Greenberg or anyone else to accept service of process on its behalf in the United States pursuant to Rule 4(h)(1)(B) of the Federal Rules of Civil Procedure. Although Aracruz stated in a Form 20–F filed with the SEC that "[o]ur agent for service of process in the United States is Greenberg Traurig, LLP," Aracruz states that it simultaneously disclosed that "it may not be possible for investors to effect service of process within the U.S. upon us or our directors, executive officers or such experts." (*See* D.E. 35–1 at 11, 13.) Aracruz further argues that the scope of Greenberg's agency relationship is limited by a 2007 Amended and Restated Deposit Agreement between Aracruz and Citibank N.A. (Aracruz's Motion at 16.) In support, Aracruz attaches a declaration from Ross Kaufman, on behalf of Greenberg, indicating that the law firm never agreed to accept service of process. (*Id.* at 17.) Similarly, Aracruz argues that it never appointed or authorized Puglisi to accept service of process aside from its designation of Puglisi as its representative for purposes of Rule 6(a) of the Securities Act of 1933. Because Puglisi's role as a designated authorized representative relates only to Aracruz's registration statement and duties under the 1933 Act and such role is distinct from that of an agent for purposes of service process, Aracruz argues service of Puglisi is inadequate under Rule 4(h)(1)(B). Finally, Aracruz argues it never authorized or appointed attorney Glenn M. Kurtz, an attorney with W & C, to act as its agent for service of process. As such, Aracruz believes the Complaint should be dismissed for insuffi-

---

**12.** Plaintiff responds that, to the extent mentioned in the Complaint, Plaintiff does not intend to raise any "market manipulation" claims under Rule 10b–5(a) or (c). (D.E. 47 at 8 n. 3.)

cient service of process under Rule 12(b)(5).

In response, Plaintiff cites to the March 31, 2008, Form 20–F signed by Aguiar and Zagury as conclusive of Aracruz's appointment of Greenberg as its agent to receive service of process. Additionally, Plaintiff notes that Aracruz designated CT Corporation as its "agent for service of process in the United States" in its 20–F forms filed between the years 2003 and 2007. (D.E. 47 at 11.) Moreover, Plaintiff contends that Aracruz submitted an unsigned and incomplete version of the Amended and Restated Deposit Agreement with Citibank.

In reply, Aracruz highlights Plaintiff's concession that service on Puglisi and W & C was insufficient. Aracruz further relies upon the language of the Deposit Agreement (which it contends was signed) and the argument that Plaintiff, as a third-party, would not be entitled to rely upon any waiver of service provision in that agreement. (D.E. 49 at 9.)

Rule 12(b)(5) sets forth the mechanism for challenging a complaint for insufficient service of process. FED. R. CIV. P. 12(b)(5). Rule 4(h)(1)(B) provides that a foreign corporation must be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant." FED. R. CIV. P. 4(h)(1)(B).

The Court finds service of process was sufficient under Rule 4(h)(1)(B). Aracruz unambiguously appointed Greenberg as "[o]ur agent for service of process in the United States" in its Form 20–F dated March 31, 2008. Unlike in future SEC filings, Aracruz did not limit the scope of this authorization. Aracruz took advan-

tage of registering and selling securities in the United States and the Court does not find it unreasonable to hold Aracruz to its authorization of Greenberg for service of process in its SEC filings. Accordingly, the Court finds service was proper and Aracruz's Rule 12(b)(5) argument is without merit.

### 2. Section 10(b) and Rule 10b–5 Claim Against Aracruz

#### a. Pleading Requirements

■ The Federal Rules of Civil Procedure generally require a plaintiff to set forth a "short and plain statement of his claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (*citing Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Fed.R.Civ.P. 8(a)(2)). Hence, while a complaint subject to a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, the complaint must provide the grounds for the plaintiff's "entitlement to relief"; labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* (citations omitted). In evaluating a motion to dismiss, courts adopt a "two-pronged approach" whereby they first (1) eliminate any allegations in the complaint that are merely legal conclusions and then (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1290 (1 1th Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950,

173 L.Ed.2d 868 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. Finally, "[o]n a motion to dismiss a claim of violation of the federal securities laws, the court may 'take judicial notice ... of relevant public documents required to be filed with the SEC, and actually filed.'" *Sherleigh Assocs., LLC v. Windmere—Durable Holdings, Inc.*, 178 F.Supp.2d 1255, 1268 (S.D.Fla.2000) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999)).

■ Plaintiff's securities fraud claims are also subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Rule 9(b) requires fraud to be plead "with particularity," but provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). This requirement is satisfied "if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir.2006) (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). The PSLRA provides that a plaintiff who alleges violations of Section 10(b) shall "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Additionally, the PSLRA provides that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

■ Section 10(b) of the Exchange Act makes it unlawful:

> ... for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—... (b) To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 states that,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "Section 10(b) was designed to protect investors involved in

the purchase and sale of securities by requiring full disclosure." *SEC v. DCI Tele-comms., Inc.*, 122 F.Supp.2d 495, 498 (S.D.N.Y.2000) (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)). The scope of liability is the same under Section 10(b) and Rule 10b–5. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 n. 17 (11th Cir.2007); *SEC v. Zandford*, 535 U.S. 813, 816 n. 1, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). " 'To allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury.' " *Garfield*, 466 F.3d at 1261 (quoting *Bryant*, 187 F.3d at 1281).

### b. Misstatements or Omissions

Aracruz argues that Plaintiff has failed to plead with sufficient particularity any false or misleading statements. First, Aracruz contends Plaintiff has not alleged any facts demonstrating the Disclosures were false or misleading at the time they were made. In other words, simply because Aracruz lost money on its currency derivative contracts in September 2008, it does not necessarily follow that Aracruz entered into contracts "far larger than necessary" that violated the company's internal policies, or that the Disclosures lacked a reasonable basis, in the first and second quarters of 2008. Aracruz offers that the *real* continued to appreciate against the U.S. dollar immediately following June 30, 2008, and third quarter contracts may have led to the eventual loss in September given the structure of the transactions. (D.E. 36 at 21–22.) According to Aracruz, many of the derivative contracts had "knock-out" provisions designed such that they would automatically terminate upon the appreciation of a currency reaching a certain level. Aracruz characterizes Plaintiff's claims as more

akin to "fraud by hindsight." (*Id.* at 22–23.) Second, Aracruz contends Plaintiff's allegation that the Disclosures failed to announce that the company's currency contracts were "larger than necessary" is vague and there are no facts demonstrating that Aracruz's disclosed positions were incorrect at the time. Third, with regard to Aracruz's financial and internal control policies, Aracruz argues Plaintiff fails to plead with particularity how and when those policies were violated. Moreover, Aracruz notes that Plaintiff quotes certain language from a Financial Policy published on the company's website that was updated on June 26, 2009, and there is no indication the policy in place at the relevant time period contained the same language regarding "non-speculative hedging." (*Id.* at 26.) Aracruz further argues that violation of its own policies would only establish mismanagement, and not fraud, and cites to *In re Winn–Dixie Stores, Inc. Securities Litigation*, 531 F.Supp.2d 1334 (M.D.Fla.2007). Fourth, with regard to Aracruz's failure to warn investors of a lack of internal controls, Aracruz argues such allegations cannot support a securities fraud claim and are in any event contradicted by Plaintiff's simultaneous allegations that the company's Finance Committee and Board of Directors maintained close supervision. Finally, with regard to Aracruz's statements about the company's financial condition, Aracruz points out that the Complaint itself alleges Aracruz's financial condition was not negatively impacted by the derivative contracts until September 2008. Aracruz further contends that the disclosures regarding significant past financial gains from the transactions should have alerted a reasonable investor to the fact that substantial risk was also present.

Plaintiff responds that it has pled Aracruz's misstatements with sufficient partic-

ularity. First, Plaintiff asserts that the company's losses directly relate to the Disclosures and Aracruz's losses must have arisen from contracts entered into prior to the period immediately before September 2008. Plaintiff additionally contends that given the nature of the derivative transactions, investors might well have assumed that any profits made in prior quarters were offset by losses in its sales contracts. Second, Plaintiff asserts the false statements were directly related to the fraudulent scheme. Relying upon *In re Sadia, S.A. Securities Litigation*, 643 F.Supp.2d 521 (S.D.N.Y.2009), Plaintiff states that Aracruz's disclosure of the extent of its derivative trading was neither conspicuous nor in close proximity to its description of the trading as non-speculative and risk-reducing. (D.E. 47 at 24.) Third, Plaintiff argues it has sufficiently alleged that Aracruz's failure to disclose its lack of adherence to its internal policies constitutes a material misstatement. Plaintiff further points to Zagury's public statements that he knew of Aracruz's losses three weeks prior to the September 6–K and Aracruz's own admission in the 6–K that it may have exceeded the limits set forth in its financial policy, as facts supporting Aracruz's alleged lack of adequate internal controls. Finally, Plaintiff clarifies that with regard to Aracruz's financial position at the time of the disclosures, it either knew or should have known that a rapid depreciation of the *real* would cause massive losses.

In reply, Aracruz argues that Plaintiff cannot dispute that the company's derivative contracts entered into between April and August 2008 were profitable. Aracruz further points to the complexity of the derivative transactions as evidence that mismanagement, and not securities fraud, is the most plausible explanation for the company's derivative losses. Regarding whether such contracts were "far larger than necessary," Aracruz believes Plaintiff has conceded it cannot demonstrate the falsity of the statements made. Furthermore, relying upon *In re Citigroup Securities Litigation*, 330 F.Supp.2d 367 (S.D.N.Y.2004), Aracruz argues that violation of internal policy does not establish a basis for a securities fraud claim and Plaintiff has yet to allege when and how Aracruz's internal policies were violated in any event. Finally, Aracruz contends its financial disclosures were accurate as snapshots of its then-existing condition and also included sufficient cautionary language regarding the risks inherent in its currency derivative trading.

The district court in *In re Sadia* dealt with a very similar set of claims and circumstances.[13] 643 F.Supp.2d 521. In that case, a major Brazilian frozen food producer and distributor engaged in currency hedging to mitigate lost profits on future sales contracts. When the *real* plunged against the dollar in September 2008, the company lost approximately $410 million on its derivative contracts. In its first and second quarter 6–Ks, the company described its hedging activity as a "form of mitigating exchange rate risk." 643 F.Supp.2d at 528. The company also disclosed in a Form 20–F that its policies "prohibit speculative trading" and the company "does not use swap contracts for trading on speculative purposes." *Id.* The plaintiffs in *In re Sadia* brought nearly identical claims that the defendant mischaracterized its hedging exposure as risk-reducing and non-speculative while its derivative positions were in reality "larger than necessary," misstated its compliance with the company's internal hedging policy, misstated the existence of adequate internal controls, and misstated the com-

---

**13.** Plaintiff's counsel also represented the plaintiffs in *In re Sadia.*

pany's financial condition. The defendant moved to dismiss the complaint pursuant to Rules 12(b)(6), 9(b), and the PSLRA.

Ultimately, the court in *In re Sadia* found plaintiffs had sufficiently pled some of their claims but not others. Because the company had "repeatedly characterized its currency hedging activity as risk-reducing and non-speculative," these representations "were both consistent throughout the Class Period and in line with the common use of currency hedging contracts," and the disclosures of the total amounts of the derivative contracts was neither conspicuous nor in close proximity to the company's alleged misstatements, the Court found the plaintiffs had adequately alleged a material misstatement had been made with regard to the company's exposure. The court in *In re Sadia* further found that the company's failure to reveal that it had entered into currency hedging contracts in violation of its internal hedging policy also sufficiently alleged a Rule 10b–5 claim. *Id.* at 532. Specifically, the court distinguished *In re Citigroup* and found "there is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis for an inference of recklessness." *Id.* Thus, the plaintiffs' claim based upon the failure to disclose non-compliance with internal hedging policies also constituted a valid claim. Nevertheless, the court believed plaintiffs' claim that the company should have disclosed a lack of adequate internal controls was contradicted by its allegations of meticulous company oversight and therefore could not form the basis of a Rule 10b–5 claim. *Id.* at 533. Finally, the court found the plaintiffs had not alleged facts supporting their claim that the company had misstated its financial condition where there were no facts demonstrating the condition of the company was affected until the *real* de-

clined in August 2008, or after the alleged misstatements. *Id.* at 533–34.

 The Court finds the analysis in *In re Sadia* highly persuasive and concludes that a similar result is appropriate in this case. Aracruz issued statements in its SEC filings depicting its currency hedging practice as a protective measure and one consistent with a reasonable investor's understanding of currency hedging. The Disclosures state that, "[t]he Company's foreign currency risk and interest rate management strategy *may use derivative transactions to protect against* foreign exchange and interest rate volatility." (Complaint at ¶¶ 33, 55) (emphasis added). The July 2008 earnings report further depicts the company's strategy as, "[p]rotecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure." Moreover, Plaintiff alleges that the Financial Policy referenced was readily available to investors on the company's website and further painted the company's hedging practice as conservative, using language such as there must be, "linkage to an effective exposure (non-speculative hedging)," there is "no leveraging involved," the "asset side objective is the same as the risk factor that is to be protected," and that "engaging in structured financial transactions with built-in derivatives is strictly prohibited." The crux of Plaintiff's Complaint is that this was not the case and Aracruz was in fact engaging in highly speculative currency derivative trading. Statements depicting the company's practice as necessary to "protect" and as "non-speculative," are inconsistent with the $2.1 billion loss Ara-

cruz eventually suffered as a result of its currency derivative trading. Additionally, like in *In re Sadia*, there was no conspicuous or simultaneous disclosure of the full extent and nature of the company's derivative contracts. Thus, the Court finds Plaintiff states a valid claim based on Aracruz's statements regarding the nature and extent of its currency hedging activities.

■ The Court also finds that Plaintiff states a valid claim based on Aracruz's failure to disclose that its currency derivative contracts had exceeded the company's own internal policies. As stated above, Aracruz's July 2008 earnings report references the company's Financial Policy and advises investors the policy can be found on the company's website. Aracruz's Financial Policy described the company's practice in terms consistent with a typical hedging practice. The Financial Policy also set limits on the company's total exposure to futures contracts based on U.S. Dollars, as acknowledged in the company's September 26, 2008, 6–K. Plaintiff additionally alleges that the company's website also described a "Financial Strategy" specifying that the company entered into forward foreign exchange contracts "to protect against market risks" and "to minimize currency risk exposure." (Complaint at ¶ 59.) Aracruz's alleged failure to disclose that it in fact was entering into currency derivative transactions that exceeded limitations imposed in its own Financial Policy (while simultaneously directing investors to rely upon and review such policy) and also violated the stated purpose and scope of such transactions as delineated in the company's policies, constitutes a valid basis for a securities fraud claim. Plaintiff is not alleging that Aracruz should have disclosed its own mismanagement. Rather, the crux of the claim is that Aracruz was advising investors regarding the nature of its currency hedging and directing them to rely upon risk assurances set forth in the company's own policies, but failed to disclose that it was in fact not following those policies. Thus, the statements render the company's guidance to rely upon the company's own internal policies misleading. As such, the Court finds Plaintiff has sufficiently alleged a claim based upon Aracruz's failure to disclose its non-compliance with the company's financial policy.

■ Nevertheless, as in *In re Sadia*, the Court finds Plaintiff fails to state a claim based upon any alleged failure to disclose inadequate internal controls or the company's statements about its financial condition. Plaintiff consistently contradicts its claim that Aracruz lacked adequate internal controls. In the Complaint, Plaintiff contends the company's executive officers, Board of Directors, and committee members all had full knowledge of the currency transactions and approved them. Plaintiff also alleges the Financial Committee was very active in monitoring the derivative transactions. Additionally, Plaintiff has not alleged any facts demonstrating that Aracruz's statements regarding the financial condition of the company were inaccurate when issued. The deterioration of the company's financial condition did not occur until after the July 2008 disclosures when the *real* depreciated dramatically against the U.S. dollar. There are no facts alleged supporting the conclusion that the financial condition of the company was inaccurately depicted at the time of the Disclosures. Accordingly, the Court finds Plaintiff fails to state a claim based upon an alleged failure to disclose a lack of adequate internal and financial controls or the failure to disclose that the company's statements about its financial condition and future business prospects lacked any reasonable basis when made.

██ Moreover, the Court finds Plaintiff has failed to plead fraud with particularity as to those statements related to Aracruz's then-existing exposure. For example, Plaintiff fails to allege how Aracruz's statements in April 2008 or July 2008 regarding its currency derivative transactions and exposure for that period were false or misleading. Aracruz stated that:

> During the three-month period ended March 31, 2008 the Company recognized gains of US$ 7.0 million on swap transactions (TJLP or interest long-term rate against the U.S. Dollar). There were no such derivative instruments for the three-month period ended March 31, 2007. As of March 31, 2008, the notional amounts of these swaps totaled US$ 345.4 million and the result oustand [sic] balance was an asset of US$ 36.2 million.

The April 2008 earnings report contained statements by Zagury that:

> At the end of the 1 Q08, we increased the level of our cash flow currency protection, to a $270 million short position in dollars, representing 5 months of future exposure, which generated a positive impact of $4 million in the quarter. We also continued to swap financial liabilities from "TJLP plus spread" into "dollar coupon" fixed rates, which generated a positive impact of $7 million during the period.

> \* \* \*

> It is also important to note that the exchange rate impact will continue to shape the market pulp business, as the devaluation of the American dollar persists, leading either to price increases or to additional closures by local producers unable to absorb the increased costs.

> \* \* \*

The Financial Income in the quarter was $10.2 million higher than in the 4Q07, mainly due to the favorable results of our gains on derivative transactions, which amounted to $13.1 million in the 1Q08 (4Q07: $3.5 million). When compared to the same period of last year, it was $21.1 million lower, mainly due to lower gains on derivative transactions (1Q07: $33.1 million).

> \* \* \*

> At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$270 million, which represented approximately 5 months of cash flow exposure to the local currency (real—R$).

Similarly, Aracruz made the following statements in July 2008:

> We increased the level of our cash flow currency protection to a short position of $360 million at the end of the 2Q08 ($270 million at the end of the 1 Q08), representing 6 months of future exposure, which generated a positive impact of $46 million in the quarter. In the first half of the year, the cash flow protection provided a gain of $15/t (when divided by the targeted full year production volume), thereby mitigating the negative impact of the Brazilian currency's appreciation against the dollar.

> \* \* \*

> The company has also been protecting its cash flow exposure to the local currency by taking short positions in dollars, which involves negligible transaction costs and has a positive carry. At the end of the quarter, the cash flow currency protection was increased, through a short position in dollars totaling US$ 360 million, which represented approximately 6 months of cash flow

exposure to the local currency (real—R$).

Plaintiff has not alleged any facts suggesting these statements were false or misleading. Rather, Plaintiff infers the statements were false after-the-fact because of the devastating losses occurring in September 2008. Nevertheless, these alleged false statements pertained to Aracruz's trading prior to June 2008. One cannot presume that Aracruz's exposure must have been different than as stated simply because it suffered losses in the future. In sum, Plaintiff does not allege any facts suggesting these statements were untrue at the time they were made. As such the PSLRA's requirement that the Complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed," has not been met and Plaintiff fails to plead fraud with the requisite particularity with regard to Aracruz's statements of the company's recorded currency derivative contracts and exposure.

Similarly, Aracruz's statements in its July 2008 6–K that, "[t]he exposure of U.S. Dollar denominated liability does not represent a risk from an economic and financial standpoint, because the future payment in local currency of such liability is offset by operating revenue which is expressed in U.S. Dollars since almost all sales originate from exportation" is not false or misleading. (*See* Complaint at ¶ 55.) Plaintiff selectively quotes the first clause of the statement and attempts to relate it to the preceding sentence that, "[t]he Company operates internationally and is exposed to market risk from foreign exchange and interest rate volatility." (*Id.*) However, as can be seen from reading the second clause of the statement, it

is unrelated to the company's assessment of its risk relating to foreign currency derivative contracts. The statement explains that liabilities owed in U.S. dollars do not present a significant issue for the company where the majority of its revenue is received in that currency. Although the statement is somewhat unwieldy and confusing, it does not relate to Aracruz's foreign currency derivative exposure or otherwise provide a basis for alleging securities fraud.

In sum, the only potentially actionable false or misleading statements pled with particularity are Aracruz's statements in April and July that, "[t]he Company's foreign currency risk and interest rate management strategy may use derivative transactions to protect against foreign exchange and interest rate volatility," and its statement in the July earnings report that, "[p]rotecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure."

#### c. Scienter

Aracruz argues Plaintiff has failed to plead scienter with particularity as required by the PSLRA and Rule 9(b). First, Aracruz argues that Plaintiff's reliance on the purported financial motives of its executives is insufficient to establish scienter. Next, Aracruz argues that the company's alleged close monitoring of its currency derivative exposure does not support its knowledge that the statements issued in its disclosures were false or severely reckless. Finally, Aracruz contends that the news articles and sources relied upon by Plaintiff fail to suggest knowledge

or severe recklessness, but rather, if anything, poor business judgment or mismanagement.

In response, Plaintiff claims it has raised sufficient circumstantial evidence of knowledge or severe recklessness that is at least as compelling as any other inferences. Plaintiff cites to various indicia of knowledge or severe recklessness such as the company shareholders' lawsuit against Zagury, Zagury's accusations that the Board of Directors were complicit, Zagury's statements that a presentation was made to the Board of Directors including information about the currency derivative contracts in June 2008, Zagury's statements that the transactions were periodically supervised and approved by the Finance Committee, the September 26, 2008 6–K's announcement that the company's exposure may have exceeded internal limits, the resignation of the Board Chairman, CFO, and several other members of the Board of Directors, as well as the sheer magnitude of the exposure. Plaintiff further relies upon *In re Sadia*, in which the district court found similar circumstances indicative of scienter.

In reply, Aracruz contends it has offered two inferences that are more plausible than that raised by Plaintiff: (1) that based on the structure of the currency derivative contracts at issue Aracruz's losses were caused by transactions entered into after the first and second quarters; and (2) that Aracruz was simply one of many corporations that exercised poor judgment or management in entering into currency derivative contracts they did not fully understand. Relying upon *In re Nokia Oyj (Nokia Corp.) Securities Litigation*, 423 F.Supp.2d 364 (S.D.N.Y.2006), Aracruz further argues that Plaintiff fails to particularly allege what information was communicated to the Board of Directors and Finance Committee, as well as when

and how such information demonstrates these individuals knew or should have known about the company's trading practices. (D.E. 49 at 20.) Aracruz also argues that the magnitude of the losses is insufficient to infer scienter. Finally, Aracruz takes issue with Plaintiff's "selective quotations" of Zagury's statements to the press. (*Id.* at 21–22.)

 As stated previously, the PSLRA provides that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "This standard requires courts to take into account 'plausible opposing inferences.'" *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1324, 179 L.Ed.2d 398 (2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). "A complaint adequately pleads scienter under the PSLRA 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (citing *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499). This entails a "holistic" evaluation of the allegations. *Id.*

 The Eleventh Circuit has characterized this as a "stringent" standard and one that requires a plaintiff to "plead 'with particularity facts giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.,* 544 F.3d 1230, 1238 (11th Cir.2008). The Eleventh Circuit has defined "severe recklessness" in this context to be "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards

of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Garfield*, 466 F.3d at 1264 (internal citations omitted). Allegations of motive and opportunity may be relevant to a showing of severe recklessness but are insufficient standing alone to prove scienter. *Bryant*, 187 F.3d at 1285–86. In examining whether a corporate defendant possessed the requisite scienter for a Section 10(b) claim, the Court should look to the state of mind of the individual corporate officials responsible for the statement. *See Mizzaro*, 544 F.3d at 1254; *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir.2004). The Court may also aggregate the factual allegations in evaluating the inference of scienter. *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 791 (11th Cir.2010) (citing *Phillips v. Scientific–Atlanta, Inc.*, 374 F.3d 1015, 1017 (11th Cir.2004)).

 As in *In re Sadia*, Plaintiff alleges sufficient circumstantial evidence supporting a strong inference that Aracruz acted with severe recklessness when it made the alleged misstatements. These allegations include Zagury's statements to the press that the Finance Committee closely supervised and monitored the company's hedging exposure on a daily basis and that this committee was responsible for reporting such information to the Board of Directors. Plaintiff also cites Zagury's statements that the company's aggressive hedging practices began in the first quarter of 2008 and the Board of Directors was informed of the company's derivative practices at a meeting in June 2008. Plaintiff also alleges that Zagury, who is responsible for several of the alleged misstatements in the company's earnings reports, was subsequently sued by the company's shareholders because of the company's derivative losses. The aftermath of the company's losses also supports an inference that the company's officers acted with severe recklessness when they made statements regarding the company's currency hedging practices. In the company's September 26, 2008, 6–K, Aracruz announced that "the maximum loss volume on derivative transactions and also the total exposure to futures contracts based on U.S. Dollars may have exceeded the limits set forth in [sic] Company's Financial Policy approved by the Board of Directors." Aracruz simultaneously announced Zagury's resignation. In the following months, at least seven other members of the company's Board of Directors or committees resigned, including one of the members of the company's Finance Committee who briefly assumed Zagury's duties as CFO. Finally, the staggering amount of loss attributed to the company's currency derivative trading supports an inference of severe recklessness when compared to the timing and nature of the alleged misstatements. In the end, Aracruz announced a loss of $2.13 billion as a result of its currency derivative contracts. Such a massive exposure stands in stark contrast to the nature of the company's practices as described in the first and second quarter of 2008. Given these circumstances, Plaintiff's allegations raise a sufficient inference that Aracruz knew or should have known it was misrepresenting the nature and extent of its currency derivative contracts and its compliance with the company's Financial Policy. This inference is at least as strong as any opposing inference. Accordingly, the Court finds Plaintiff has sufficiently pled scienter with regard to its claim against Aracruz.

#### d. Causation

 Next, Aracruz contends Plaintiff fails to allege any proximate causation be-

tween the alleged misstatements regarding the company's exposure to exchange rate risk and the eventual loss in value of its ADRs which only dropped when the company announced material financial losses. Aracruz offers that its stock declined as a result of announced losses, and not the announcement of its foreign currency derivative positions. In essence, Aracruz believes that had it only announced its exposure in September 2008, and the *real* had not plummeted against the U.S. dollar, the value of its ADRs likely would have been unaffected.

In response, Plaintiff alleges loss causation is adequately pled. Plaintiff points to the company's disclosures that its use of derivative instruments was to protect against foreign exchange rate volatility. Aracruz's subsequent admissions that it may have exceeded limits imposed by its Financial Policy and the fair value of its currency derivative contracts was negative $1.02 billion, revealed that Aracruz was engaging in speculative currency trading. According to Plaintiff, the sharp decline in ADR value and the significantly increased trading following these announcements illustrate the link further. Plaintiff also cites to statements by financial analysts in the market indicating surprise at the use and extent of Aracruz's currency derivative contracts.

In reply, Aracruz believes the decline in ADR value is more likely explained by its announcements that it "lost a lot of money in the wake of an unprecedented worldwide financial crisis." (D.E. 49 at 22.) According to Aracruz, Plaintiff's allegations concerning the extent and fair value of its currency derivative contracts were not corrective disclosures and the market was in fact reacting to Aracruz's huge losses.

 Plaintiff has "the burden of proving that the act or omission of the defen-

dant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. Section 78u–4(b)(4). "[N]either the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss" and plaintiffs need only comply with Rule 8's notice pleading standard with regard to loss causation. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

The Court finds Plaintiff has adequately pled loss causation. According to the Complaint, Aracruz misrepresented the purpose, nature, and extent of its currency derivative contracts and its compliance with the company's Financial Policy. On September 26, 2008, announced that its exposure to such contracts may have exceeded the company's limits and that its CFO was resigning as Brazil's currency plummeted against the U.S. dollar. Aracruz's ADRs declined sharply in price after this announcement, losing approximately 25% of their value in the next two days of trading. On October 3, 2008, Aracruz announced the value of its currency derivative contracts was a staggering negative $1.02 billion, a loss figure Plaintiff alleges is inconsistent with its prior representations. The value of Aracruz's ADRs dropped approximately another 51% over the course of the next two days of trading following this announcement. Thus, the Court finds Plaintiff has met its burden under Rule 8 by sufficiently pleading loss causation.

### e. Safe Harbor and "Bespeaks Caution" Doctrine

 Finally, Aracruz contends that its Disclosures are protected as forward-looking statements by the PSLRA's safe harbor provision and the "bespeaks caution" doctrine. Aracruz argues that the alleged misstatements in its Disclosures are for-

ward-looking statements in that they inform investors of the company's use of derivative instruments to reduce risk prospectively. Moreover, Aracruz believes its disclosures are accompanied by meaningful cautionary language including that the company "is exposed to market risk from foreign exchange and interest rate volatility" and that "foreign exchange and interest rate[s]" experience "volatility." (D.E. 36 at 40.) These disclosures also incorporate the company's Form 20–F which provides further warnings regarding the company's derivative trading activity. (*Id.* at 40–41.) Aracruz adds that Plaintiff fails to plead that any of the statements were made with actual knowledge of their falsity.

Plaintiff responds that Aracruz's statements are not protected by the safe harbor provision or "bespeaks caution" doctrine. Plaintiff contends Aracruz had actual knowledge the statements were false at the time they were made because the company had already engaged in speculative currency derivative trading. Plaintiff also contends Aracruz's statements regarding its purported exposure and level of cash flow protection are statements of historical fact, and not forward-looking statements as defined by the PSLRA. Regarding Aracruz's cautionary language, Plaintiff believes such language consists of "boilerplate risk disclosures" and do not contain any disclosure that Aracruz's Financial Policy would be disregarded. Plaintiff also believes that any warning about the risk associated with entering into currency derivative contracts in the future is drastically different from warning about the massive positions the company had taken and the resulting losses that were mounting.

In reply, Aracruz believes that the statements at issue are, at worst, mixed present—and forward-looking statements entitled to safe harbor protection. Moreover, Aracruz argues Plaintiff fails to allege with particularity how the company's actual exposure differed from its reported amounts, how the reported exposure resulted in shareholder loss, or why the reported exposure amounts were intentionally and fraudulently misstated as opposed to the result of simple miscalculation. Aracruz further argues that its cautionary language warns investors of a risk similar to that actually realized. Nor could Aracruz have more actively warned investors that it would violate its own Financial Policy or trading limits in the future. Thus, Aracruz believes its statements are protected by the safe harbor provision of the PSLRA and the "bespeaks caution" doctrine.

The PSLRA provides a "safe harbor" for certain "forward-looking statements." 15 U.S.C. § 78u–5(c)(1).[14] "In that safe harbor, corporations and individuals may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999). The Eleventh Circuit has explained that a defendant may avoid liability by showing: (1) the forward-looking statement was issued with meaningful cautionary language; (2) the statement was simply immaterial; or (3) that the plaintiff fails to prove that the statement was made with actual knowledge that it was false. *Jabil Circuit*, 594 F.3d at 795. Obviously, the first step of the analysis requires examining whether the alleged false statements are even "forward-looking statements."

**14.** The PSLRA's safe harbor provision is the "statutory equivalent" of the Eleventh Circuit's "judicially created bespeaks caution doctrine." *Jabil Circuit*, 594 F.3d at 796.

The PSLRA defines a "forward-looking statement" as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i)(1). The Act further compels the court "to consider not only 'any statement cited in the complaint' but also 'any cautionary statement accompanying the forward-looking statement, which are [sic] not subject to material dispute, cited by the defendant.'" *Harris,* 182 F.3d at 802 n. 2 (citing 15 U.S.C. § 78u–5(e)).

Plaintiff has alleged with sufficient particularity the following false statements made in April and July 2008:

The Company's foreign currency risk and interest rate management strategy may use derivative transactions to protect against foreign exchange and interest rate volatility. (Complaint at ¶¶ 33, 55.)

\* \* \*

Protecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure. (*Id.* at ¶ 57.)

Although somewhat ambiguous, the first statement, issued in both Aracruz's April and July 6-Ks, is not a forward-looking statement. It informs investors that the company "may" engage in such transactions as deemed necessary to mitigate foreign currency and interest rate risk. It contains no projections, estimates, or forecasts of future success. Nor does it articulate the company's plans for the future. Those courts that have found statements protected by the safe harbor provision have almost uniformly dealt with statements containing projections, estimates, or forecasts of future events. *See Harris,* 182 F.3d at 805 (finding a press release that contained a list of factors relating to the company's generic drug business that would influence its third quarter results was forward-looking); *Ehlert v. Singer,* 245 F.3d 1313, 1317–18 (11th Cir.2001) (finding a section of a prospectus discussing the company's future success and risk factors that might affect its performance constituted a forward-looking statement); *In re 21st Century Holding Co. Secs. Litig.,* 2008 WL 5749572 at \*12–15, 2008 U.S. Dist. LEXIS 108196 at \*35–42 (S.D.Fla. 2008) (finding various statements of future

economic performance, projections, or estimates to constitute forward-looking statements). The statement's veracity is also not dependent on the company's future actions. The statement is also in close proximity to other notes about the company's derivative results for the past quarter and is more appropriately read as an explanation of the purpose of such transactions. In short, it is not the species of statement the PSLRA's safe harbor provision is concerned with.[15] The second statement is also not a forward-looking statement. Rather, it is an assertion that the company "maintained its strategy" using derivative instruments for protection during the last quarter, and that this strategy was in compliance with the company's financial policy. As such, Aracruz's alleged misstatements are not protected by the safe harbor provision or bespeaks caution doctrine. Accordingly, Aracruz's Motion must be denied.

## C. Individual Defendants' Motions

Aguiar and Vieira jointly move to dismiss the Complaint pursuant to the PSLRA and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. They also move to dismiss based on a lack of personal jurisdiction pursuant to Rule 12(b)(2).[16] Aguiar and Vieira believe Plaintiff fails to demonstrate they purposefully directed their activities at the United States. With regard

---

**15.** Alternatively, even if these statements were forward-looking they are not accompanied by meaningful cautionary language and Plaintiff has alleged Defendants' actual knowledge of their falsity at the time they were issued. Cautionary language is "meaningful" if the warning mentions "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Harris*, 182 F.3d at 807 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). "In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.* Despite Aracruz's selective re-arrangement of its April 2008 disclosure, there is no cautionary language to speak of in that disclosure. Aracruz essentially asserts that the allegedly misleading statement is also its own cautionary language. In its July 2008 disclosure, Aracruz adds that, "[t]he Company operates internationally and is exposed to market risk from foreign exchange and interest rate volatility." While this language on first glance appears to caution the investor regarding risks similar to those that caused the loss in this case, the opposite is true. In this statement, Aracruz identifies that it is exposed to foreign exchange and interest rate volatility due to its international operations. If anything, the alleged false statement, that Aracruz uses a "foreign currency risk and interest rate management strategy [that] may use derivative instruments to protect against foreign exchange and interest rate volatility," is supposed to constitute the cautionary language for investors. In essence, the company is suggesting to investors that its use of derivative instruments mitigates the risk inherent in its business. Thus, the Court finds that July 2008 disclosure does not contain meaningful cautionary language relating to the company's derivative instrument use.

Aracruz also is not entitled to safe harbor protection where Plaintiff sufficiently pleads that the statement was made with actual knowledge of its falsity. Under the PSLRA, a forward-looking statement made by a business entity is entitled to protection if "the plaintiff fails to prove that the forward-looking statement—... was ... (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). Plaintiff alleges Zagury and Aracruz knew the company was already engaging in speculative trading beyond that described in the Disclosures.

**16.** As stated previously, as the Individual Defendants have now been served through alternative service and pursuant to the Inter-American Convention, the Court deems moot Defendants' Rule 12(b)(5) insufficient service of process argument.

to the Section 20(a) claim, they believe personal jurisdiction is lacking where the alleged control was exercised abroad. Aguiar additionally claims that the fiduciary shield doctrine should apply and Plaintiff may not rely upon his signatures of the various disclosures because he signed them solely in his capacity as CEO and President of Aracruz. Both Vieira and Aguiar believe Plaintiff fails to satisfy the "effects test" set forth in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and exercise of personal jurisdiction would be unreasonable. As to Plaintiff's Section 10(b) and Rule 10b–5 claims, Aguiar and Vieira claim Plaintiff fails to allege scienter with particularity as required by Rule 9(b) and the PSLRA.[17] Finally, as to Plaintiff's Section 20(a) claim, they contend the Court should adopt a "culpable participation" requirement and Plaintiff fails to plead control with particularity as to Vieira.

Zagury moves to stay the proceedings against him under the doctrine of international abstention or dismiss the claims against him under forum non conveniens, for lack of personal jurisdiction, or for failure to state a claim. Zagury believes the Court should stay these proceedings against him in light of the CVM's investigation and the lawsuit brought by Aracruz shareholders against him in Brazil. He suggests Brazil possesses a stronger interest in litigating the related claims against Zagury and also serves as a much more convenient forum. As such, Zagury also argues the claims against him should be dismissed based upon forum non conve-

niens and reinstated in Brazil. Furthermore, Zagury summarily adopts those arguments raised by Aguiar and Vieira as to personal jurisdiction. (*See* D.E. 79 at 30.) Next, Zagury argues the Complaint fails to plead with particularity scienter or any false statements made by him, any alleged misstatements fall within the safe harbor for forward-looking statements, and there can be no Section 20(a) liability where Zagury did not have any control over Aracruz's Disclosures or corporate policy.

In response, Plaintiff relies upon *Calder* and *SEC v. Carrillo,* 115 F.3d 1540, 1542 (11th Cir.1997), and asserts that the Individual Defendants' status as company executives and directors does not insulate them from personal jurisdiction.[18] Plaintiff contends that Aguiar, Vieira, and Zagury were all primary participants in the fraud which was perpetrated on American investors and that each have demonstrated minimum contacts with the United States. Moreover, Plaintiff argues the exercise of personal jurisdiction comports with due process where litigating this action here does not create an undue burden on the Individual Defendants, this country has an obvious interest in enforcing its federal securities laws, Plaintiff has a substantial interest in obtaining relief in this forum, this Court will provide the most efficient resolution of the matter, and public policy is in favor of protecting American investors. Noting only Aguiar and Zagury claim protection under the fiduciary shield doctrine, Plaintiff asserts the doctrine is inapplicable. Relying upon *In re Sadia,*

---

**17.** Aguiar and Vieira also attempt to adopt and incorporate Aracruz's arguments that Plaintiff fails to plead any false or misleading statements with particularity, Plaintiff fails to plead causation sufficiently, and the disclosures are protected by the safe harbor provision and the "bespeaks caution" doctrine. (*See* D.E. 77 at 11 n. 1, 30.) Plaintiff also

reiterates its arguments made in opposition to Aracruz's Motion. (*See* D.E. 91 at 5.)

**18.** Plaintiff asserts the Court possesses specific jurisdiction, and *not* general jurisdiction, over the Individual Defendants. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

Plaintiff maintains the Complaint sufficiently pleads scienter with regard to Aguiar, Vieira, and Zagury.[19] Plaintiff offers that Vieira served as Chairman of the Board of Directors and the Board met sometime in June 2008 where a presentation regarding Aracruz's derivative trading was made. According to Plaintiff, Vieira and Zagury directly controlled the company's entrance into wildly speculative currency bets. Finally, Plaintiff notes that Aguiar concedes he is a control person for Section 20(a) purposes while the Eleventh Circuit has rejected a culpable participation standard for liability. As to Zagury, Plaintiff responds that abstention is inappropriate where concerns of international comity do not exist, this forum is fair to all litigants, and abstention would waste judicial resources. Plaintiff also contends that consideration of the public and private interests support litigating the claims against Zagury in this forum and not in Brazil.

In reply, Vieira reiterates that the Complaint fails to allege his involvement with any actionable misstatement or any facts demonstrating a motive for fraud or knowledge of the company's currency derivative trading. Aguiar contends his involvement is only alleged to the extent he signed Aracruz's Disclosures. Aguiar further contends the application of the fiduciary shield doctrine is an open question in the Eleventh Circuit. Both Vieira and Aguiar claim the Complaint fails to allege that any information regarding derivative trading was actually provided to them. Nor were they members of the Financial Committee, which according to the Complaint received periodic information regarding Aracruz's currency derivative contracts. Additionally, they believe the Complaint fails to allege what information was communicated to the Financial Committee and how that information would have placed anyone on notice that the Disclosures were false or misleading. In sum, Aguiar and Vieira believe Plaintiff's allegations fail to include any direct involvement on their part in the company's derivative trading or calculation of potential exposure.

In reply, Zagury reiterates that Plaintiff's allegations at most amount to evidence of bad business judgment or mismanagement. Zagury distinguishes the decision in *In re Sadia* as limited given its failure to consider the liability of the individual defendants involved. Moreover, Zagury offers that he never signed any disclosures filed with the SEC and the transactions at issue involved activities conducted in Brazil between Brazilian entities. Thus, Zagury lacks minimum contacts with this forum. He also restates his belief that the exercise of personal jurisdiction would be unreasonable and should be precluded under the fiduciary shield doctrine. Finally, Zagury urges abstention or dismissal based on forum non conveniens due to the hardships inherent in defending the action here and his assertions that resolution in Brazil should be favored. Thus, the Individual Defendants request the Court dismiss the claims against them.

### 1. Personal Jurisdiction

Rule 12(b)(2) permits parties to move for dismissal based on a lack of personal jurisdiction. Upon such a motion, plaintiffs bear the burden of demonstrating the existence of personal jurisdiction. *In re Parmalat Sec. Litig.*, 376 F.Supp.2d 449, 452 (S.D.N.Y.2005). Where no discovery has yet taken place,

---

**19.** Plaintiff suggests the CVM Report also bolsters an inference of scienter. (D.E. 91 at 9.) As the CVM Report was neither referenced in nor attached to the Complaint, its consideration would be inappropriate at this stage.

"the plaintiff need make only a prima facie showing of jurisdiction by pleading in good faith, legally sufficient allegations of jurisdiction." *Id.* (internal citations omitted). A prima facie case is established "if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Carrillo,* 115 F.3d at 1542 (quoting *Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990)).

 The Exchange Act permits the exercise of personal jurisdiction "to the limit of the Due Process Clause of the Fifth Amendment." *SEC v. Dunn,* 587 F.Supp.2d 486, 509 (S.D.N.Y.2008). "It is well established that 'the due process clause ... constrains a federal court's power to acquire personal jurisdiction' over a nonresident defendant." *Carrillo,* 115 F.3d at 1542. Due process requires that "(1) the nonresident defendant has purposefully established minimum contacts with the forum ... and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Id.* (citing *Francosteel Corp. v. M/V Charm.,* 19 F.3d 624, 627 (11th Cir.1994)).

### a. Minimum Contacts

[28] Minimum contacts are shown where the defendant's contacts with the applicable forum: (1) are related or have given rise to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully avails itself of the benefits and protections of a forum's laws; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum. *See id.* (citing *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1545 (11th Cir.1993)).[20] Other courts have suggested that in order to extend specific jurisdiction over a defendant based

upon conduct occurring outside the United States, the plaintiff must demonstrate the defendant's acts caused effects in the United States, which were direct and foreseeable as a result of the actions abroad, and the defendant knew or should have known that the actions would have effects in the United States. *See Dunn,* 587 F.Supp.2d at 509; *In re Parmalat,* 376 F.Supp.2d at 455. In conducting the analysis, "[e]ach defendant's contacts with the forum must be assessed individually." *Calder,* 465 U.S. at 790, 104 S.Ct. 1482.

 Based upon the facts alleged in the Complaint, the Court finds it lacks personal jurisdiction over Vieira. Plaintiff fails to demonstrate a prima facie showing of jurisdiction where the Complaint fails to allege any facts demonstrating minimum contacts between Vieira and the United States. Unlike Aguiar, Vieira did not sign any of the Disclosures. Unlike Zagury, no misstatements are attributed to him either. Plaintiff has failed to plead any facts suggesting that Vieira had any contacts with this forum, let alone any contacts giving rise to Plaintiff's cause of action or demonstrating purposeful availment. Nor are there any contacts such that Vieira should reasonably anticipate being haled into court here. At best, Plaintiff speculates that Vieira, as Chairman of the Board of Directors, was aware of Aracruz's currency derivative transactions and of those allegedly false statements issued. Plaintiff supports this theory with barebones allegations that Vieira may have been present at a meeting of the Board of Directors sometime in June 2008, where some form of information regarding Aracruz's currency derivative transactions (which at the time were likely profitable) was presented.

---

**20.** The applicable forum in this case is the United States. *See id.* at 1543; *Dunn,* 587 F.Supp.2d at 509 n. 32 ("Because federal court jurisdiction is premised on a federal statute rather than diversity of citizenship, the forum applicable for contacts analysis is the United States").

These types of conclusory and speculative allegations fail to support personal jurisdiction.[21] Thus, the Complaint must be dismissed as to Vieira due to lack of personal jurisdiction.

As to Aguiar, the Court finds the Complaint alleges sufficient minimum contacts with this forum. Aguiar signed both the April 2008 and July 2008 6–Ks filed with the SEC containing the alleged misstatements. Courts have frequently asserted personal jurisdiction over individual defendants who sign or approve forms required by the SEC which they knew or should have known would be relied upon by American investors. *See In re Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334, 351–52 (D.Md.2004); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F.Supp.2d 509, 551 (D.N.J.2005); *In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 305–06 (E.D.N.Y.2002). Aguiar's contacts with this forum, the signing of Aracruz's April and July 2008 SEC disclosures, are directly related to Plaintiff's cause of action and demonstrate purposeful availment of the benefits and protection of U.S. law. Aguiar must have known that the SEC disclosures he was signing would be directed at the United States and investors here would use and rely upon such disclosures. Additionally, by signing Aracruz's 6–K's, Aguiar could reasonably anticipate being haled into court here. Thus, the Court finds Plaintiff alleges Aguiar possessed sufficient minimum contacts with this forum.

Finally, with regard to Zagury, the Court also finds sufficient minimum contacts. Plaintiff alleges misleading or false statements are contained in the CFO Comments sections of the April 2008 and July 2008 earnings reports. The statements contained in these sections were authored and signed by Zagury. The earnings reports were published in English. They also contained a symbol in the upper right hand corner of each page noting that Aracruz's ADRs were listed on the New York Stock Exchange. The CFO Comments also describe the company's financial operations in terms of U.S. dollars and according to Generally Accepted Accounting Principles. The earnings reports announced an earnings conference call that could be accessed by dialing an American telephone number. The reports warn that certain statements may be covered under Section 21E of the Exchange Act. According to the Complaint, Zagury was most directly responsible for Aracruz's currency derivative transactions.[22] Zagury's statements in the April and July 2008 earnings reports are directly related to Plaintiff's cause of action. They also indicate purposeful availment of the benefits and protection of U.S. law as they were intended to reach an audience of investors in this country. Zagury's involvement in Aracruz's currency derivative trading in Brazil also caused direct and foreseeable effects in the United States. Given Zagury's involvement in conduct directly affecting this forum and statements directly targeted towards U.S. investors, Zagury should have reasonably anticipated being haled into court in this forum. Thus, the Court finds Zagury possesses sufficient minimum contacts with this forum.

### b. Fiduciary Shield Doctrine

The fiduciary shield doctrine "is a judicially created principle that pre-

---

21. Alternatively, the Court notes that the allegations against Vieira fail to support a sufficient inference of scienter.

22. Although not mentioned in the Complaint, Plaintiff claims in its opposition that Zagury rang the NYSE bell on May 30, 2007, to commemorate the fifteenth anniversary of Aracruz's ADRs trading in the United States.

cludes the exercise of personal jurisdiction over nonresident corporate agents or employees who are acting in the forum state in their role as corporate agents or employees." *Lane v. Capital Acquisitions & Mgmt. Co.*, 2006 WL 4590705 at *4 n. 8, 2006 U.S. Dist. LEXIS 96422 at *13 n. 8 (S.D.Fla.2006) (citing 79 A.L.R.5th 587 (2000)). "The rationale of the doctrine is 'the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.'" *Id.* (quoting *Doe v. Thompson*, 620 So.2d 1004, 1006 (Fla. 1993)). The Eleventh Circuit has not expressly adopted the fiduciary shield doctrine and the application of the doctrine is in question in cases where jurisdiction is premised upon a federal statute permitting nationwide service of process. *See SEC v. Prime Time Group, Inc.*, 2010 WL 780198 (S.D.Fla. Mar. 2, 2010). Some courts have expressed reluctance to adopt the doctrine in part based upon language in the Supreme Court's decision in *Calder* that individual defendants' "status as employees does not somehow insulate them from jurisdiction" based upon their contacts with the forum. *See Calder*, 465 U.S. at 790, 104 S.Ct. 1482; *HomeBingo Network, Inc. v. Chayevsky*, 428 F.Supp.2d 1232, 1245 (S.D.Ala.2006). Based upon *Delong* and *Prime Time Group*, Aguiar and Zagury urge the Court to adopt the doctrine where a corporate officer is not physically present in the relevant jurisdiction during the commission of the alleged tort.

 The Court declines to apply the fiduciary shield doctrine in this case. Were the Court to adopt Aguiar and Zagury's approach, foreign corporate officers would rarely, if ever, be subject to personal jurisdiction in this country based on violations of federal securities laws. Cor-

porate officers in foreign countries are easily able to commit violations of the federal securities laws without ever stepping foot in the country. Moreover, due process does not require a defendant's physical presence in a forum in order to exercise personal jurisdiction. The court in *Delong* indicated that the crucial inquiry is not whether the defendant's conduct or acts were solely in his or her capacity as a corporate officer or director. *See Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 852 (11th Cir.1988). Rather, the court evaluated the corporate officer's physical presence in the forum as one component of the analysis. *Id.* at 849. In any event, there is no protection under the fiduciary shield doctrine for conduct that constitutes fraud. *See Leedom Fin. Servs., LLC v. Bass*, 2010 WL 2367106 at *3 (M.D.Fla. June 14, 2010). Accordingly, the Court finds Aguiar and Zagury are not protected by the fiduciary shield doctrine.

### c. Reasonableness

 In assessing the reasonableness of exercising personal jurisdiction the court must consider: (1) the burden on the defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most efficient resolution; and (5) the shared interest between states in furthering substantive social policies. *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Delong*, 840 F.2d at 854.

 The Court finds the exercise of personal jurisdiction over Aguiar and Zagury is not unreasonable. While it is true that defending this action in this forum will be less convenient for Defendants than if the lawsuit was in Brazil, the Court finds it is not so unduly burdensome that juris-

diction is unreasonable. The Eleventh Circuit has noted that, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 947 (11th Cir. 1997). Additionally, "modern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." *Id.* at 947–48. Travel between Miami and Sao Paolo is not unduly burdensome. Moreover, other courts have recognized that requiring Brazilian defendants to travel to the United States is not burdensome. *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. de Equip. Medico,* 563 F.3d 1285, 1299 (Fed.Cir. 2009). Next, the United States has an obvious interest in enforcing its federal securities laws and protecting its markets. *See Carrillo,* 115 F.3d at 1547; *In re Ahold,* 351 F.Supp.2d at 353. Plaintiff's interest in obtaining relief in this forum also merits consideration. Plaintiff's choice of forum is entitled to some deference and certainly obtaining relief in this forum is substantially more convenient and effective than it would be for a class of American investors to seek relief in Brazil. Additionally, this Court will provide a more efficient resolution of those claims against both the corporation and the Individual Defendants. Finally, there is a strong policy interest in permitting U.S. investors to seek relief and protection from fraud by foreign corporations. Thus, the Court finds that the exercise of personal jurisdiction over Aguiar and Zagury does not offend traditional notions of fair play and substantial justice.

### 2. Section 10(b) and Rule 10b–5 Claims Against Aguiar and Zagury

As discussed *supra* in Section II.B.2, the only actionable statements alleged against Aracruz are its statements in April and July 2008 that, "[t]he Company's foreign currency risk and interest rate management strategy may use derivative transactions to protect against foreign exchange and interest rate volatility," and its statement in the July 2008 earnings report that, "[p]rotecting the company's exposure to the local currency, according to the financial policy approved by the Board and outlined on Aracruz's website, the management maintained its strategy of hedging the cash flow and balance sheet exposure to the local currency, using derivative instruments to protect against foreign exchange and local interest rate exposure."

 Under the group pleading doctrine, "the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as Annual Reports, ... press releases, or other 'group published information' that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation." *Durgin v. Mon,* 659 F.Supp.2d 1240, 1254 (S.D.Fla.2009). Although the Eleventh Circuit has questioned the continued viability of the doctrine in light of the reforms instituted by the PSLRA, it has explicitly declined to rule on the issue. *See Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1018–19 (11th Cir.2004). In any event, Aguiar signed both the April and July 6–K forms.

 Nevertheless, the doctrine does not apply with regard to pleading scienter. *See Durgin,* 659 F.Supp.2d at 1254 (citing *Hubbard v. BankAtlantic Bancorp, Inc.,* 625 F.Supp.2d 1267, 1282 n. 9 (S.D.Fla.2008)). Plaintiff bases its inference of scienter as to Aguiar on several questionable premises: that his position as CEO means he must have had detailed knowledge of Aracruz's currency hedging

transactions; that the existence of the company's speculative trading "was an open secret among Aracruz's directors and executives"; that Aguiar must have been present at the company's June 2008 Board of Directors meeting even though he is not alleged to have served on the Board during the relevant time period; Aracruz's massive losses; and Zagury's statements to the press that the transactions were backed by the Financial Committee and the Board. None of these premises are supported by particularized facts and they collectively do not allow an inference of scienter sufficient to support a Section 10(b) claim against Aguiar. They are at best speculative and conclusory; largely based upon Aguiar's position in the company. Many of the allegations fail to have any connection with Aguiar as he did not serve on the Financial Committee. Nor does Plaintiff allege any particularized facts as to what information was presented to the Board of Directors at the June meeting. Plaintiff also fails to allege any concrete or personal benefit either Aguiar or Zagury would have received as a result of the fraud. Moreover, Plaintiff's reliance on *In re Sadia* is somewhat misplaced as that decision did not deal with the liability of the individual corporate officers. In sum, Plaintiff infers scienter as to Aguiar based simply on his position at the company and the fact that he signed Aracruz's SEC filings. The Court finds this insufficient and thus the Section 10(b) claim against Aguiar must be dismissed for failure to state a claim.

The Complaint contains more particularized allegations of scienter with respect to Zagury. As Aracruz's CFO, Zagury was responsible for the company's currency derivative operations. He admits that he executed certain of the currency derivative contracts. Zagury is also the author of many of the disclosures discussing the nature and extent of the company's currency derivative transactions. According to interviews he conducted with the press since his resignation, he has also indicated that he prepared daily written reports for the members of the Financial Committee reporting on the company's positions and exposure. He also suggested that the transactions were reviewed and approved by the Financial Committee and the Board of Directors. An inference of scienter is further supported by his statements that the company was "betting on the *real*." In addition, his later resignation, along with others including those involved with the review of currency derivative information, suggests an inference of scienter. Finally, his knowledge of the company's Financial Policy, along with the company's real time currency derivative positions and exposure, would suggest severe recklessness in the issuance of statements that the company "may" engage in currency derivative trading to "protect" against risk and that this practice was in compliance with the goals and limits of the financial policy. Thus, the Court finds Plaintiff has sufficiently pled its Section 10(b) claim against Zagury.

### 3. Section 20(a) Claims Against Aguiar and Zagury

In order to state a claim under Section 20(a) for "control person" liability, a plaintiff must allege (1) a primary violation of the Exchange Act, (2) the defendant had the power to control the general affairs of the primary violator, and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation. *Laperriere v. Vesta Ins. Group, Inc.,* 526 F.3d 715, 723 (11th Cir.2008) (citing *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996)). The Eleventh Circuit has declined to adopt a "culpable participation" standard and has instead indicated a controlling person is

derivatively liable under section 20(a) if that person "acted recklessly in failing to do what he could have done to prevent the violation." *Id.* at 725. Aguiar concedes he is a control person as CEO of Aracruz. Although admitting he executed currency derivative transactions and reported their results to the company, Zagury claims he had no control over the Disclosures or corporate policy with regard to Aracruz's derivative trading. The Court disagrees. The Complaint alleges that Zagury was responsible for managing and implementing the currency derivative practice of the company. As CFO, Zagury provided comments in the company's earnings reports and issued statements regarding the company's derivative trading and exposure. Thus, the Court finds Plaintiff has sufficiently alleged Section 20(a) claims against both Aguiar and Zagury.

### 4. International Abstention and Forum Non Conveniens

#### a. International Abstention

■ The doctrine of international abstention enables courts to abstain and stay proceedings in this country in favor of litigation proceeding elsewhere. In examining whether abstention is appropriate courts must consider issues of international comity, fairness to litigants, and the efficient use of scarce judicial resources. *See Turner Entm't Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir.1994). International comity "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1223 n. 25 (11th Cir.1999) (quoting *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). In

looking at the fairness to litigants the court should consider the order in which the suits were filed, the more convenient forum, the possibility of prejudice resulting from abstention, and the risk of inconsistent judgments. *See Turner,* 25 F.3d at 1521–22; *Posner,* 178 F.3d at 1224. Finally, with regard to the efficient use of scarce resources, courts must consider the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, whether the actions have common parties and issues, and whether the alternative forum is likely to render a prompt resolution. *Turner,* 25 F.3d at 1522.

■ The Court finds the claims against Zagury should not be stayed based on the doctrine of international abstention. First, principles of international comity do not favor abstention. This case is distinct from those proceedings already brought in Brazil. The shareholder action brought against Zagury is brought on behalf of the company. In addition, the CVM investigation in no way will decide the rights of aggrieved shareholders. Plaintiff additionally notes that enforcement proceedings brought by the Securities and Exchange Commission and parallel civil lawsuits are quite common in the U.S. (D.E. 91 at 32 n. 23.) With regard to fairness to litigants, this factor also does not favor abstention. Zagury acknowledges that this lawsuit was filed first. There is no risk of inconsistent judgments where the proceedings in Brazil do not involve the same claims under federal securities laws. Moreover, while Brazil may be more convenient for Zagury and for purposes of discovery, that forum would prove inconvenient for Plaintiff and any putative class members. Finally, the Court does not believe the efficient use of judicial resources compels abstention. The proceedings in Brazil involve different issues and parties and their parallel resolution will not result in piecemeal litigation

or otherwise waste resources. Accordingly, the Court denies Zagury's request to stay the claims against him pursuant to the doctrine of international abstention.

### b. Forum Non Conveniens

■ To prevail on a motion to dismiss for forum non conveniens, the moving party must demonstrate that (1) an available and adequate alternative forum exists, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his or her suit in the alternative forum without undue inconvenience or prejudice. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–62, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Leon v. Millon Air, Inc.,* 251 F.3d 1305, 1311 (11th Cir.2001); *BCCI Holdings,* 119 F.3d at 951.

■ First, "the defendant must demonstrate both the availability and the adequacy of the proposed alternative forum." *Tyco Fire v. Hernandez Alcocer,* 218 Fed.Appx. 860, 865 (11th Cir.2007) (internal citation omitted). Generally, a forum is available if defendants are amenable to service of process or the opposing party consents to jurisdiction in the alternative forum. *See Piper Aircraft Co.,* 454 U.S. at 242, 102 S.Ct. 252. A forum is generally adequate if it can provide some relief for plaintiff's claims. *See id.* Additionally, a forum is still adequate even if "the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum." *Id.* at 247, 102 S.Ct. 252. Plaintiff concedes that Brazil is an adequate forum.

■ If an available and adequate alternative forum exists, the district court then considers "all relevant factors of private interest, weighing in the balance a strong presumption against disturbing [domestic] plaintiffs' initial forum choice." *C.A. La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir.1983); *see also* *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) ("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *Leon,* 251 F.3d at 1311. These private interest considerations are factors affecting the convenience of the litigants. *See Gulf Oil Corp.,* 330 U.S. at 508, 67 S.Ct. 839. These factors include "ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Leon,* 251 F.3d at 1314. Because of the strong presumption that plaintiff has chosen a sufficiently convenient forum, "defendants in such cases are required to prove 'vexation' and 'oppressiveness' that are 'out of all proportion' to the plaintiff's convenience." *Id.* at 1315 (quoting *Piper,* 454 U.S. at 241, 102 S.Ct. 252).

■ Plaintiff's choice of forum is entitled to a strong presumption of convenience. Moreover, the Court need not dismiss this action merely because an adequate alternative forum exists. *Ancile Inv. Co. v. Archer Daniels Midland Co.,* 2009 WL 3049604 at *7 (S.D.N.Y. Sept. 23, 2009). Zagury complains that the primary sources of proof are located in Brazil and he has no ability to compel witnesses or documents necessary to prove his case. He also offers that American attorneys may not depose witnesses in Brazil and the use of letters rogatory to obtain evidence will only serve to delay this litigation. The need for translation of documents and testimony is also cited as a reason for dismissal. Zagury claims his defense is based on misrepresentations made to him by the banks selling the currency derivative contracts to Aracruz and conducting the proceedings here will only make things

more difficult, slow, and expensive. The Court finds that these private interests do not outweigh or rebut the presumption in favor of Plaintiff's choice of forum. Although the majority of proof may be located in Brazil, many of the documents and records are likely electronically stored and can easily be transferred. In addition, while the use of letters rogatory may not be ideal, it serves as a sufficient process for compelling witness testimony. This case also does not "center around an analysis of Brazilian legal issues" and thus is easily distinguishable from *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F.Supp.2d 30, 38–39 (D.D.C. 2002), cited by Zagury.

■ The public interests also do not weigh in favor of dismissal. "Relevant public interest factors include the sovereigns' interest in deciding the dispute." *SME Racks Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1104 (11th Cir.2004) (quoting *BCCI Holdings*, 119 F.3d at 953). They also include "court congestion and jury duty generated by controversies decided at home; the desirability of having localized controversies decided at home; and the difficulties attendant resolving conflict-of-law problems and applying foreign law." *La Seguridad*, 707 F.2d at 1307. The Eleventh Circuit has emphasized that "there is a strong federal interest in making sure that plaintiffs who are United States citizens generally get to choose an American forum for bringing suit, rather than having their case relegated to a foreign jurisdiction." *Id.* (quoting *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1311 (11th Cir.2002)). Given the strong interest in protecting the choice of American plaintiffs, the lack of conflict-of-law problems, and the minor role Brazilian law will play, if any at all, in this case, the Court finds the public interests do not weigh in favor of dismissal.

Finally, the Court must ensure that a plaintiff can reinstate their suit in the alternative forum without undue inconvenience or prejudice. *See Perez–Lang v. Corporacion de Hoteles, S.A.*, 575 F.Supp.2d 1345, 1353 (S.D.Fla.2008). While Plaintiff may reinstate its action in Brazil it has already spent years litigating this action in this forum. Thus, the Court finds that based upon consideration of all the necessary factors dismissal on grounds of forum non conveniens is inappropriate.

### III. Conclusion

The Court finds that Plaintiff adequately pleads a limited violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder as to Aracruz and Zagury, but otherwise fails to state a claim with respect to Aguiar. The Court finds that it lacks personal jurisdiction as to Vieira and he must be dismissed. Nevertheless, the Court finds Plaintiff has adequately pled its Section 20(a) claims against Aguiar and Zagury. Finally, these proceedings need not be stayed or dismissed under the doctrines of international abstention or forum non conveniens as to Zagury. Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Defendant Zagury's Motion to Strike (D.E. 102) is **DENIED;**

2. Defendant Aracruz's Motion to Dismiss the Amended Class Action Complaint (D.E. 35), previously denied on the docket (see D.E. 69), is **DENIED;**

3. Defendants Aguiar and Vieira's Motion to Dismiss the Amended Class Action Complaint (D.E. 74), is **GRANTED IN PART and DENIED IN PART;** and

4. Defendant Zagury's Motion to Stay These Proceedings and Dismiss the

1412

Amended Complaint (D.E. 79), is **DENIED.**